# THE SUPREME COURT

### OF

## THE STATE OF MISSOURI,

JULY TERM, 1855, AT JEFFERSON CITY.

21 277
38a 462
38a 471

———⋅•◆•⋅———

HALBERT, Appellant, *vs.* HALBERT & OTHERS, Respondents.

1. What were the terms of a parol transfer of a slave, is a question of fact for the jury, from all that was said and done, and not a question of law for the court.
2. A condition annexed to a gift of a slave, that the donee shall have children born, is valid; and upon failure of the condition, the slave will revert to the donor.

*Appeal from Crawford Circuit Court.*

This was an action brought by James Halbert, in 1852, to recover a slave claimed by the defendants as belonging to the estate of Nathan Halbert, their intestate.

At the trial, it appeared in evidence that Nathan Halbert was a son of the plaintiff, and that the slave was given to him by his father, and remained in his possession up to the time of his death, some ten or fifteen years afterwards. There was no writing evidencing the terms of the gift; but William J. Allen,

a witness for the plaintiff, testified that the plaintiff, upon the marriage of his children, put in their possession a slave, "which was to be theirs upon the condition that they should have issue," and he had often heard Nathan Halbert, in his life time, say that this was the way he held the slave in controversy. Nathan Halbert never had any children. Several witnesses testified that he always recognized the slave as the property of his father, and refused to sell him for that reason, and frequently complained that his father had not done right by him, in not giving him an absolute right to the slave.

At the close of the plaintiff's case, the court instructed the jury that he could not recover, holding, as a matter of law upon the evidence, that there was an absolute gift, and a remainder over, and that this remainder was void.

*C. Jones,* for appellant, in his brief, insisted that the court erred in taking the whole case from the jury.

*M. Frissell,* for respondent. The gift was absolute and the condition void. (*Betty* v. *Moore,* 1 Dana, 235. Fearne on Remainders, 460, 463. *Wilson* v. *Cockrill,* 8 Mo. 3.)

LEONARD, Judge, delivered the opinion of the court.

In *Wilson* v. *Cockrill,* (8 Mo. Rep. 1,) and again in *Vaughn* v. *Guy,* (17 Mo. Rep. 429,) this court decided that, after a grant of a personal chattel to one, a limitation over to another, upon the death of the first taker, was void, and that the absolute property was in the first grantee. There are two grounds upon which these decisions may be placed; one, that the limitation over, being upon a dying without issue, which has been construed to mean an indefinite failure of issue—a want of descendants, at any time, sooner or later, whenever it should occur, and not a want of them at the death of the first taker, or at any other definite point of time—the effect of it, if applied to real property, would have been to create an estate tail by necessary implication; and, therefore, being here applied to personalty, carried the whole interest, according to the rule

that terms, which, if applied to real property, would give an estate tail, pass the absolute interest in personal property, and left nothing in the grantor upon which the limitation over could take effect; (*Anderson* v. *Jackson*, 16 Johns. 381, and cases there referred to;) and, second, that, although such future interests in personal chattels, if limited to spring up within a proper period of time, so as not to violate the rules against perpetuities, are valid at law, when created by will, as executory bequests, and good in equity as equitable estates through declarations of trust, yet they are not allowed at common law in the disposition of personal chattels by conveyances *inter vivos*. (Chitty's Black. 2 B. 398.) If the dying without issue meant an indefinite failure of issue, the limitation over was void, in a conveyance of real property, because the effect of a limitation over upon such an event was to create an estate tail, by necessary implication, in the first taker; and then the future interest that was to arise upon the regular expiration of the estate was void, as tending to a perpetuity; and in a conveyance of personal property, the limitation over was void, because the same words, instead of creating an estate tail, that could not be in such property, passed the absolute interest, leaving no reversion in the grantor out of which the future estate could take effect. But if it meant a definite failure of issue, as for instance, at the death of the first taker, the limitation over, although good as an executory use, in a conveyance of real property operating under the statute of uses, was void in a transfer *inter vivos* of a mere personal chattel, as an attempt to create in this manner a future interest at law in such property.

It may be observed here, that limitations of future interests in chattels, both real and personal, came originally out of the courts of equity, where they were first recognized as lawful limitations of property. Lord Hardwicke, in 1742, remarked, (*Beauclerk* v. *Dormer*, 2 Atk. 312,) " the first case of an executory devise (of terms for years) was Mathew Manning, 8 Co. 95; afterwards came Lampet's case, 10 Co. 46, *b*, and

several others, which were all on terms for years, and partook of the realty, but the judges had no notion of extending it to a personalty. Courts of equity have gone further still, and have admitted of the like limitations in personal as in chattels real;" and afterwards, in 1757, Lord Mansfield, ( *Wright* v. *Cartwright*, 1 Burr. 282,) arguing in favor of allowing the same limitations of terms for years by deed that were lawful by testamentary disposition, said: " When they came to be allowed by will, or by declaration of trust, the *substantial reason* was the same for allowing them by deed." In the progress of the law, bequests of mere personal chattels have now become valid as legal dispositions of property, (10 Johns. Rep. 12;) and the remark of Lord Mansfield might now, perhaps, be repeated in favor of allowing future interests in personal chattels to be created by deed as well as by will, but the remark is not called for by the present case.

In the two cases decided in this court, to which we have referred, the grants were in writing, and the meaning of the terms used fixed by judicial interpretation, and there were express limitations over to third persons; but here, there is no writing, and no express limitation over to another, or express reservation to the grantor. Those decisions, therefore, do not settle this case; but in the case of *Betty* v. *Moore*, (1 Dana, 235,) there was no written grant, but an express reservation to the grantor, if the donee died without having children; and it was there held that the gift was absolute, passing the whole property, and the reservation void; and it was probably upon the authority of this decision, that this case was decided in the court below. What the terms of this grant were, we think, was a question for the jury, and not a matter of law for the court; but, assuming them to have been as stated by Mr. Allen, the most favorable witness for the defendants, we do not think they were such as would have created an estate tail, if applied to real property, and, therefore, passed the whole interest here, under the rule to which we have referred. If the grant had been in writing, and an express provision inserted in

the language of the witness, " that the slave should be the son's, upon condition that he had issue," the question would have been, whether these terms would have created an estate tail, in a conveyance of real property, and this question carries us back to the now obsolete doctrines of the common law, in relation to fees conditional, before the statute of entails. Blackstone (2 Book, 87,) defines them to be fees restrained to some particular heirs to the exclusion of others ;" and Powell, Justice, in *Idle* v. *Cook*, (1 P. Will. 74,) says : " A fee tail was a fee simple at common law ; for there were three sorts of fees simple—absolute—qualified, which was as to time only, sct., as long as such a tree stood, and also fee simple conditional, which was limited as to the heirs inheritable, for it was not a fee accruing upon the performance of a condition." In reference to the words necessary to create this fee conditional of the common law, we are told (Black. Com. 2 Book,) that, as the word heirs is necessary to create a fee, so the word body, or some other word of procreation is necessary to make it a fee tail." But Preston on Estates, (2 vol. 484,) says : " As far as relates to deeds, the word heirs must be used either in terms or by reference and adoption ; but the precise words "of the body" are not necessary ; and there is one class of cases where an estate tail will arise by necessary implication, without the use of the word heirs, contrary to the general rule, and this is where there is a gift to one without any limitation to his heirs, but with a provision that the land shall revert to the donor, or remain to another, if the donee shall happen to die without heirs of his body. This consequence proceeds from the expression of the time when the land comprised in the grant shall revert or go over, from which it is necessarily concluded to be the intention of the parties that the donee shall have the land in the mean time, (2 Preston on Estates, 474–5, 486–7 ;) and, therefore, according to Fleta, a limitation to a donee and his heirs, if he shall have heirs of his body, without any reservation or limitation over upon a failure of issue, will give a fee on condition and not a limited fee, properly denominated an estate

tail, and (Preston on Estates, 2 vol. 503,) says there is no case in which a limitation in this form has been adjudged an estate tail, nor any determination to the contrary. In Roper on Legacies, (2 vol. 1525-6,) it is said that "it is a settled rule of construction, proved by a numerous class of cases, that, where estates of inheritance are devised to A., and if he dies without heirs of his body, or without issue, to B., A. takes an estate tail by necessary implication. The rule is the same in bequests of chattels real and other personal estate ; for A., the legatee, being entitled by the express bequest for life only, and B., the legatee over, being entitled to nothing, upon the single event of A.'s death, but upon that event coupled with the general failure of A.'s issue, if A. were not considered as taking immediately for himself and his issue, the interest between his death and the event upon which B. could take, would be undisposed of ; therefore, as the words are large enough, the court implies an intention in the testator to transmit the legacy to A.'s issue ; but as chattels cannot be entailed, the absolute interest in them, *ex necessitate*, must vest in B. " (*Brooks* v. *Lord Lake*, 10 Jur. 485.) And this is the reason of the general rule, adopted at first in the construction of wills, that, whenever the words used in a disposition of personal property would, if applied to real property, give an estate tail, they pass an absolute interest in personalty. (*Lyon* v. *Mitchell and others*, 1 Mad. 256.)

There being therefore here, according to the testimony of Mr. Allen, no express reservation or limitation over, upon the son's dying without issue, in which this is distinguished from the Kentucky case, but the terms used being that the slave should be the son's, upon condition that he had no issue, instead of creating an estate tail, they create a conditional gift to the son, to become absolute if a child should be born to him, but to cease if he should have no children ; and the grantor is, of course, entitled to the benefit of the condition, although it could not have been reserved or transferred to a stranger. It seems hardly necessary to remark upon this subject, that a con-

dition is a clause providing that an estate shall be created, enlarged, diminished or defeated in a given event ; that it may be annexed to any species of estate—to an estate in fee, in tail, for life, or for years—and that the benefit of it can only be reserved to the grantor and his heirs, who, upon a breach of the condition, become entitled to the estate to which it was annexed. (Cruise Dig. tit. 13, chap. 1 and 2.)

If, however, instead of confining ourselves to the testimony of Mr. Allen, we look at the whole matter, it is very manifest, we think, that if it were a conditional, instead of an absolute gift, about which, we, of course, express no opinion, the father had no reference to an indefinite failure of issue on the part of his son, but intended what he said, that if his son had children, if any were born to him, the slave should be his absolutely ; otherwise, it should return to the father. Even where there is an express limitation over upon a dying without issue, in a written disposition of personal property, the courts have laid hold of very slight circumstances to confine the generality of the words to the time of the death of the donee. In *Keely* v. *Fowler*, (6 Brown P. C. 309,) Chief Justice Wilmot said, in relation to this matter : " The truth is, we are bound to an artificial and technical sense of those words, unless there is an apparent intention in the testator of using them in their natural meaning ;" and Buller, Justice, in *Doe* v. *Lyde*, (1 Term Rep. 593,) quoting this remark, said : " And for that purpose, which is in favor of common sense, the most trifling circumstance is sufficient." As in the present case, the gift was not in writing, the terms of it are to be inferred from all that was said and done upon the occasion, and not exclusively from any particular expression used, and, under such circumstances, no artificial meaning can be put upon a verbal reservation or limitation, contrary to the real intent of the party. The question is, what was the intention of the giver ? Did he intend that the slave should be his son's absolutely, if he had children born to him ? If so, this was a lawful limitation of the property, and it belonged to the son or the father, according to the

event; or did he intend to make a disposition that the law would not allow of, by providing that it should go in succession, like an inheritance, to his son, and to his son's children, and to their children, as long as there should be descendants to take, and return to him only upon a total failure of the son's descendants, sooner or later, whenever that event should occur? If so, that intention cannot prevail, and the property vests at once absolutely in the son, and the reservation over is void.

The testimony, however, we may remark, does not warrant the imputation of any such intention to the father, and, indeed, it would require very decisive evidence to justify a jury in imputing such a purpose to a giver, as the law will not allow it to be executed, if it be in fact entertained.

The Circuit Court, we think, erred not only in the conclusion to which they came, as to the legal effect of the transaction, whether we take Mr. Allen's account of it, or look to all the evidence in the cause; but it erred, also, in withdrawing the case from the jury, and determining the whole matter, both law and fact. The terms of the gift was a matter of fact, to be ascertained by the jury, and not a question of law for the judgment of the court. The interpretation of written contracts is for the court; but where the matter rests in words, and the intention of the parties is to be ascertained from what they have said and done, it is a question for a jury. (*Festerman* v. *Parker*, 10 Iredell's Law Rep. 477. *Fowle* v. *Bigelow*, 10 Mass. 392.) If the father, in this instance, had made a written disposition of the slave, it would have been the duty of the court to have ascertained his intentions from the words used, according to the rules of law applicable to the interpretation of written instruments. The purpose of parties in reducing transactions to writing being, that the very words used may stand as the exclusive evidence of their whole intention. Here, however, there being no writing, and the intention being left to be ascertained by the words used, and the things done, it was a question for the jury; but when ascertained, it

was then for the court to declare hypothetically the legal effect of the transaction.

We conclude by remarking that the questions involved in the case are, whether the transaction was a loan, to be resumed at the pleasure of the father, or a gift ; and if it were a gift, whether it was absolute or qualified ; and, if qualified, what was the qualification annexed to it ? Was it a condition that the slave should be the son's, if he had children born to him ; or was it a provision to transmit the slave to the son's descendants, as long as there should be descendants, and to secure a return of the slave to the giver upon a failure of descendants, whenever that event should occur ? We have already remarked that, if it were the former, it was a lawful purpose, and must prevail ; if the latter were the intention of the father, the law will not carry it into execution, but makes the grant take effect as an absolute, immediate gift of the whole property to the son.

The other judges concurring, the judgment is reversed, and the cause remanded for further proceeding, in conformity with this opinion.